# EXHIBIT 1



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

New Case Electronically Filed: COMPLAINT
February 24, 2022 09:32

By: JOSHUA B. FUCHS 0087066

Confirmation Nbr. 2481618

JACOB D. SPARKS

vs.

JUSTIN FITZHUGH

CV 22 959954

**Judge:** HOLLIE L. GALLAGHER

**Pages Filed:** 18

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **JACOB D. SPARKS**<br>c/o his attorneys<br>The Fuchs Firm<br>24870 Fairmount Boulevard<br>Beachwood, Ohio 44122<br><br>    Plaintiff,<br><br>v.<br><br>**JUSTIN FITZHUGH**<br>6705 Vickery Creek Road<br>Cumming, GA 30040<br><br>    Defendant. | CASE NO.<br><br>JUDGE<br><br>**COMPLAINT**<br>(with jury demand) |

For his Complaint against Defendant Justin Fitzhugh, Plaintiff Jacob Sparks states as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff was at all relevant times herein a United States citizen and a Florida resident.

2. Defendant Justin Fitzhugh is an individual who, at all times relevant, resided in Florida and Georgia.

3. This court has jurisdiction over Sparks' claims, and venue is proper in this Court, because the events giving rise to this action occurred in or are connected to Cuyahoga County. In addition, the contract that is the subject of this Complaint, which is attached at EXHIBIT 1, contains a venue clause directing that Cuyahoga County is the proper venue for disputes related to that contract.

## FACTUAL BACKGROUND

4. Sparks is a nationally recognized leader in retail development and recruiting.

5. Nations Lending Corporation ("NLC") is a full-service mortgage lender, with its principal place of business in Independence, Ohio.

6. NLC offers FHA, VA, Conventional, Jumbo, and USDA loans. It is an agency-direct lender with Fannie Mae, Freddie Mac, and Ginnie Mae and retains serving rights on approximately 96 percent of the loans it originates.

7. In 2013, after months of searching and due diligence, Sparks approached NLC to determine if his retail development and recruiting abilities would be a good fit for NLC.

8. Due to the sensitivity of the discussions, on July 23, 2013, NLC and Sparks entered into a *Non-Circumvention, Non-Disclosure, and Confidentiality Agreement* so they could freely explore the potential relationship.

9. After obtaining the non-circumvention agreement, Sparks then reached out to his brother-in-law, Fitzhugh, and introduced Fitzhugh as a potential recruiter to NLC.

10. At the conclusion of their discussions, NLC proposed hiring both Sparks and Fitzhugh as recruiters.

11. On September 23, 2013, the parties executed a written employment agreement (the "Agreement") which outlined their respective contractual obligations. A true and accurate copy of the Agreement is attached as EXHIBIT 1.

12. Under the Agreement, Sparks and Fitzhugh were both employed by NLC "to recruit and procure loan originators and branch offices."

13. For the first six months of the Agreement, Sparks and Fitzhugh were each paid a salary of $10,000 per month plus a percentage of commissions earned as a result of loans closed by loan originators and branches recruited by Sparks and/or Fitzhugh.

14. After the first six months of the Agreement, Sparks and Fitzhugh were paid exclusively by a percentage of commissions earned as a result of loans closed by loan originators and branches recruited by Sparks and/or Fitzhugh.

15. Under the Agreement, all commissions generated through the industry of Sparks and Fitzhugh were pooled, and all compensation generated by Sparks and Fitzhugh's efforts split equally between Sparks and Fitzhugh.

16. Over the following 4+ years, Sparks and Fitzhugh grew NLC's loan base by **3,000%** -- bringing NLC from under $20 million in closed loans per month to more than $200 million of closed loans per month.

17. Indeed, in 2018, Inc. 5000 recognized NLC as one of the fastest-growing privately held companies in the country, and the company was named a top-100 lender by National Mortgage Professional Magazine and Scotsman Guide in 2019.

18. That growth is directly attributable to Sparks and Fitzhugh's work.

19. Beginning in early 2017, Fitzhugh began to demand that Sparks renegotiate the breakdown of compensation paid to each of them under the Agreement.

20. Fitzhugh and Sparks were unable to reach any agreement to amend the terms of the Agreement.

21. On February 26, 2018, Fitzhugh resigned his employment with NLC.

Electronically Filed 02/24/2022 09:32 / / CV 22 959954 / Confirmation Nbr. 2481618 / CLAJB

22. Two days later, NLC's attorney wrote to Sparks informing him that Fitzhugh's resignation terminated the September 23, 2013 Agreement. A true and accurate copy of that letter is attached as EXHIBIT 2.

23. However, Fitzhugh's resignation had absolutely no impact on Sparks' contractual relationship with NLC under the Agreement.

24. Rather, the Agreement could not be terminated except as specified in Paragraph 15, which reads as follows:

> This Agreement, and/or the employment of Sparks, or Fitzhugh cannot be terminated by NLC except for the following reasons:
>
> (a) Due to the willful misconduct of either Sparks, or Fitzhugh which is not corrected within thirty (30) days of both (i) a meeting in person with Recruiters, and NLC to specifically address such misconduct (ii) receipt of written notice of such misconduct by NLC to each Sparks and Fitzhugh;
> (b) If NLC receives official written notice from a regulatory or governmental authority within the mortgage industry that the employment of either Sparks or Fitzhugh is in direct violation of the law;
> (c) Sparks or Fitzhugh is convicted of a crime which will cause NLC to lose their approval with Fannie May, Freddie Mac, Ginnie Mae, or FHA lending authority;
> (d) Either Sparks or Fitzhugh are subject to a non-compete or other restrictive agreement as described in paragraph 4;
> (e) If either Sparks of Fitzhugh are convicted of a felony which would cause NLC to not be able to employ them pursuant to regulatory guidelines.

25. None of the circumstances enumerated in Paragraph 15 of the Agreement at EXHIBIT 1 existed to support or substantiate Sparks' termination.

26. In fact, Sparks fulfilled every material obligation that he owed under the Agreement from his execution through the date of its termination.

27. Fitzhugh returned to work with NLC within 72 hours of Sparks' termination.

28. Over the following weeks, Sparks made numerous attempts to engage NLC and continue his work there, but NLC refused to do so.

29. Despite his best efforts to mitigate his damages, the termination of the Agreement has caused Sparks monetary damage and loss.

## COUNT ONE
### Breach of Contract

30. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

31. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

32. The Agreement at EXHIBIT 1 gave rise to implied duties of good faith and fair dealing between Plaintiff and Defendant.

33. That duty includes the obligation, *inter alia*, to refrain from conduct that destroys or injures the other party's right to receive the benefits of the contract.

34. Through the acts described above, Defendant breached his duty of good faith and fair dealing owed to Sparks.

35. As a direct and proximate result of Defendant's breach of duty described in this Count, Sparks has suffered damages in an amount to be determined at trial.

## COUNT TWO
### Breach of Duty Owed to Partner or De Facto Partner

36. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

37. By entering into the Agreement, Sparks and Fitzhugh agreed to associate with each other to carry on the business of recruiting loan officers and branches for NLC.

Electronically Filed 02/24/2022 09:32 / / CV 22 959954 / Confirmation Nbr. 2481618 / CLAJB

38. By entering into the Agreement, Sparks and Fitzhugh agreed to pool the commissions accrued through their recruiting efforts for NLC.

39. By entering into the Agreement, Sparks and Fitzhugh agreed to split equally all compensation payable from NLC created through their work.

40. Sparks and Fitzhugh's relationship with respect to the Agreement was that of partners.

41. As partners with respect to the Agreement, Sparks and Fitzhugh owed each other fiduciary duties of loyalty and good faith.

42. Fitzhugh breached his fiduciary duty to Sparks by, *inter alia*, resigning from NLC and reinstituting his relationship with NLC just days later to the detriment of Sparks.

43. As a direct and proximate result of Defendant's breach of duty described in this Count, Sparks has suffered damages in an amount to be determined at trial.

WHEREFORE, Sparks prays for judgment in his favor, as follows:

i. Against Defendant and in favor of Sparks on each of the Counts of his Complaint in an amount in excess of $25,000 to be determined at trial;

ii. An award of pre- and post-judgment interest;

iii. An award of costs and attorneys' fees, as applicable under relevant law and the Agreement at EXHIBIT 1; and

iv. Any further relief, legal or equitable, to which Sparks may be entitled.

/s/ Joshua B. Fuchs
_____
Joshua B. Fuchs (0087066)
THE FUCHS FIRM LLC
24870 Fairmount Boulevard
Beachwood, Ohio 44122

Tel. and Fax: 216-505-7500
josh@fuchsfirm.com

/s/ Scott D. Perlmuter
_____
Scott D. Perlmuter (0082856)
4106 Bridge Avenue
Cleveland, Ohio 44113
216-308-1522
Fax: 888-604-9299
scott@tittlelawfirm.com

## JURY DEMAND

Plaintiff demands a trial by jury of all eligible claims and issues.

/s/ Joshua B. Fuchs
_____
Joshua B. Fuchs

# Exhibit 1

Electronically Filed 02/24/2022 09:32 / / CV 22 959954 / Confirmation Nbr. 2481618 / CLAJB

## AGREEMENT

THIS AGREEMENT is made and entered into on September 23, 2013, by and between Justin Fitzhugh and Jacob Sparks ("Recruiters"), and Nations Lending Corporation, an Ohio corporation ("NLC").

The parties make the following recitals as background for this Agreement:

WHEREAS, NLC is an established mortgage banker which operates in multiple states, and which desires to expand its operations, in the states in which it already operates, as well as in other states through the addition of successful branch offices.

WHEREAS, Recruiters have demonstrated the ability to recruit mortgage producers; and

WHEREAS, the parties contemplate that Recruiters primary efforts will be directed to recruiting new branch offices and loan originators (Hereafter referred to as "Recruits") for NLC. Recruiters will also help develop and establish the necessary systems, departments and procedures within NLC to build a successful support structure for the Recruits; and

WHEREAS, the parties wish to establish a business relationship to their mutual advantage.

NOW, THEREFORE, in consideration of these premises, the undertakings made hereafter, the sum of $10, and for other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. The recitals made above are true and correct.

2. NLC hereby employs Recruiters to recruit and procure loan originators and branch offices in any state in which NLC currently conducts business and in all locations in which NLC shall hereafter conduct business. Recruiters shall not be limited by any type of territory restrictions in any state which NLC chooses to conduct business. Recruiters shall be supervised and directly report to Jeremy Sopko and William Osborne. There shall be no additional layers of authority/management between Recruiters and Jeremy Sopko/William Osborne.

3. From the time this Agreement is executed until the termination of this agreement, any branch office that joins NLC will be considered a Recruit whether directly recruited by

JF JS                                                                                       WLO JF

Recruiters or not. Within 30 days from the execution of this Agreement, NLC shall provide a list to Recruiters of prospects NLC has been working with prior to the execution of this agreement, which shall be excluded from this provision. Current NLC branch offices which shall be excluded from this provision and which will not be considered a Recruit are listed on Exhibit A to this Agreement, which is attached hereto and incorporated herein; should any office listed on Exhibit A relocate, such relocation shall not cause that office to be considered a Recruit.

4. Sparks and Fitzhugh each separately represents and warrants that he is not subject to any restrictive agreement prohibiting him from taking employment with NLC. Sparks and Fitzhugh each separately and specifically represents and warrants that his employment with NLC will not violate any non-compete agreement(s).

5. Compensation.

5.1. For the first six (6) months of employment, NLC shall pay each Sparks and Fitzhugh a salary of ten thousand dollars ($10,000) per month.

5.2. For the first six (6) months of employment, in addition to the salary set forth above in paragraph 5.1, Recruiters shall be paid the total of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This amount shall be divided equally between Sparks and Fitzhugh and shall be in the form of W-2 earnings payable not later than forty-five (45) days after each applicable loan funds.

5.3. Beginning on the seventh (7th) month of employment, both Sparks and Fitzhugh shall be paid on a commission-only basis as follows: NLC shall pay Recruiters ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This amount shall be divided equally between Sparks and Fitzhugh and shall be in the form of W-2 earnings payable not later than forty-five (45) days after each loan funds.

6. NLC agrees to disclose to Recruiters all direct and investor PAR pricing before markup or profit. NLC shall disclose all company financials (audited and non-audited) with Recruiters.

7. NLC shall pay for all travel costs, and all pre-approved marketing costs. NLC shall supply Recruiters with an NLC corporate credit card to be used for travel and pre-approved marketing expenses incurred in the execution of Recruiters' job duties. If Recruiters expend

JF JS      2      WR JF

personal funds for authorized travel or marketing costs, NLC shall reimburse Recruiters within 15 days after Recruiters submit such costs to NLC on an approved expense form. Recruiters and NLC shall mutually agree upon a travel and marketing budget within 30 days of the execution of this Agreement, which can be changed as needed and as agreed upon by NLC and Recruiters. All marketing and advertising must be pre-approved by either NLC's President or CEO before distribution.

8. Recruiters shall be eligible to participate in all NLC benefit plans, including insurance, in accordance with the terms of the plan documents and NLC practices.

9. While working for or on behalf of NLC, Recruiters, within the mortgage industry shall exclusively work for NLC. Recruiters shall not conduct any business activities from any NLC office other than for NLC without the specific, written consent of NLC. Recruiters shall not have direct or indirect ownership interest (either individually or jointly) in any third party that provides products and/or services to NLC or NLC's customers, without the prior written consent of NLC's Board of Directors. Spark's and/or Fitzhugh's request to partake in such business ventures or activities shall be approved so long as the proposed business venture or activity: (i) does not directly or indirectly compete with NLC's business; (ii) does not interfere with Recruiter's duties and responsibilities with NLC; and/or (iii) does not cause any regulatory concern or burden for NLC.

10. Due to the confidential nature of Recruiters' relationship with NLC, the trust that NLC will place in Recruiters, and the damages that NLC is likely to sustain if such information were divulged to NLC's competitors, the public, and/or any third party, Sparks and/or Fitzhugh shall not at any time while working for or on behalf of NLC or after the termination of their relationship with NLC for any reason, directly or indirectly divulge or reveal to any individual or entity, any information which he may have secured during the course of his employment with regard to NLC's business affairs, techniques, customer lists, policies, plans, finances, trade secrets; provided that this prohibition shall not apply to information which, through no fault of Sparks or Fitzhugh, is in the possession of, or is known to, competitors of NLC, members of the residential mortgage or real estate industry, or the general public. Recruiters shall only discuss, divulge, or communicate such information to employees of NLC with whom the CEO and/or President have explicitly authorized.

JF JS               3            WLO SF

11. All copyrights, patents, trade secrets or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes or works of authorship developed or created jointly or severally by Recruiters during their employment with NLC, including but not limited to any marketing or advertising piece, any sales, telemarketing or recruiting script, or sales or recruiting strategy (collectively, the "Work Product") shall belong exclusively to NLC and shall, to the extent possible, be considered a work made by Sparks and/or Fitzhugh for hire for NLC. Recruiters each jointly and severally agree to assign, and automatically assigns at the time of creating the Work Product, without any requirement of further consideration, any right, title or interest Fitzhugh and/or Sparks may have in such Work Product to NLC. Upon request of NLC, Fitzhugh and/or Sparks shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.

12. Sparks and Fitzhugh each separately agrees that while an employee of NLC and, as long as NLC is not in breach of paragraph 14; for a period of twelve (12) months after his termination, resignation, or separation of the employment relationship for any reason, he shall not, directly or indirectly (whether on his own behalf, working with others, or on behalf of any other person, business or entity) approach, solicit, entice or attempt to approach, solicit or entice:

(a) Any NLC employee, any person who had been employed by NLC within the six (6) months prior to Recruiter's termination, resignation, or separation of employment, any contractor or consultant, or any persons in the process of being recruited to leave the employment of NLC, to end or to modify any existing relationship with NLC, or not to enter a relationship with NLC; or

(b) Any NLC customer, or past customer (any customer who closed a loan with NLC within the two (2) years prior to Recruiter's termination, resignation, or separation of employment) to terminate or to place any portion of his/her business elsewhere or otherwise interferes with NLC's business.

Sparks and Fitzhugh each acknowledges and agrees that the restrictions contained in this paragraph 12 are necessary to protect other legitimate interests of NLC. Sparks and Fitzhugh each acknowledges that all of the restrictions in this paragraph 12 are reasonable in all respects, including duration, territory and scope of activity. Sparks and Fitzhugh each agrees that any

JF  JS                                    4

violation or breach of his post-employment obligations set forth in paragraph 12 will result in irreparable injury to NLC for which no adequate remedy at law may be available.

13. This Agreement shall be binding on NLC, its successors and assigns.

14. Upon termination of the employment of either Sparks and/or Fitzhugh, NLC shall collectively pay Recruiters the total of ███████████████████ of all non-brokered loans originated and closed by Recruits for a period of 24 months as follows: ████
████████████████████████████████████████████████████████████
███████████████████████, and then divided equally and paid to Sparks and Fitzhugh. Payment(s) to Sparks and Fitzhugh after termination of their employment shall be made and treated on a 1099 basis, and Sparks and Fitzhugh shall each be solely responsible for any respective applicable taxes which might apply. However, this paragraph 14 shall be voided and neither Sparks nor Fitzhugh entitled to any further payment, compensation, commission or thing of value, if: (a) at any time during the 24 months following termination of employment, either Sparks or Fitzhugh engages in any activity in violation of paragraph 12 above.

15. This Agreement, and/or the employment of Sparks, or Fitzhugh cannot be terminated by NLC except for the following reasons:

(a) due to the willful misconduct of either Sparks, or Fitzhugh which is not corrected within thirty (30) days of both (i) a meeting in person with Recruiters, and NLC to specifically address such misconduct (ii) receipt of written notice of such misconduct by NLC to each Sparks and Fitzhugh;
(b) if NLC receives official written notice from a regulatory or governmental authority within the mortgage industry that the employment of either Sparks or Fitzhugh is in direct violation of the law;
(c) Sparks or Fitzhugh is convicted of a crime which will cause NLC to lose their approval with Fannie Mae, Freddie Mac, Ginnie Mae, or FHA lending authority;
(d) either Sparks or Fitzhugh are subject to a non-compete or other restrictive agreement as described in paragraph 4;



5



(e) if either Sparks or Fitzhugh are convicted of a felony which would cause NLC to not be able to employ them pursuant to regulatory guidelines.

Termination pursuant to paragraph 15(a) above requires ninety (90) days advanced written notice, which shall not be given before the expiration of the 30-day correction period described in paragraph 15(a). Termination pursuant to either 15(b), 15(c), 15(d), or 15(e) requires fifteen (15) days advanced notice.

Written notice of any misconduct committed by Sparks and/or Fitzhugh required to be given per paragraph 15(a) shall be given to both Sparks and Fitzhugh regardless of whether the misconduct is committed by Sparks, Fitzhugh, or both Recruiters. Accordingly, Sparks and Fitzhugh each hereby waives any argument concerning any local, state, or federal privacy, employment or other applicable law which might normally preclude the disclosure of one employee's misconduct to another. Notice in accordance with this paragraph 15(a) will be deemed given when hand-delivered, or delivered via overnight mail service and addressed as follows:

for Justin Fitzhugh:

1272 SW Walter Ave
Lake City, FL 32024


for Jacob Sparks:

PO Box 1479
Lake City, FL 32056


16. Both NLC and Recruiters agree that the promises, obligations and covenants undertaken under this Agreement have been agreed to freely, voluntarily and without duress, and that they do not impose undue hardship on either party. Should any section of this Agreement be held invalid, unenforceable, or unconstitutional by any governmental body or court of competent jurisdiction, such holding shall not diminish the validity or enforceability of any other section of this agreement.



6

17. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without giving effect to any provisions regarding conflict of laws. The exclusive venue for any litigation arising from this Agreement shall be any federal or state court of competent jurisdiction located in Cuyahoga County, Ohio. Sparks, Fitzhugh, and NLC each waive their right to object to such venue or make a motion to transfer venue.

18. In the event of any litigation arising from this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable costs and expenses incurred, including but not limited to court costs and attorneys' fees.

19. This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements, arrangements, and understanding with respect thereto. No representation, promise, inducement, statement or intention has been made by any party hereto that is not embodied herein, and no party shall be bound by or liable for any alleged representation, promise, inducement, or statement not so set forth herein. This Agreement may not be modified or amended except by written instrument executed by William Osborne, and Jeremy Sopko, and Justin Fitzhugh, and Jacob Sparks.

IN WITNESS WHEREOF, the parties have executed this agreement on the date written above.

Nations Lending Corporation:

_____
William Osborne, Jr. (President)

_____
Jeremy Sopko (CEO)

Recruiters:

_____
Justin Fitzhugh

_____
Jacob Sparks

7

## EXHIBIT A

| Street Address | City | State | Zip Code | Other Trade Names | NMLS ID | Status |
|---|---|---|---|---|---|---|
| | | | | | | Licensed in |
| 2159 McCulloch Blvd, #4 | Lake Havasu City | AZ | 86403 | None | 222071 | 1... |
| 626 Josephine Parker Drive, Suite 201 Office # 4 | Key West | FL | 33040 | Nations Home Loans Corporation | 929370 | 1... |
| 1770 Indian Trail -Lilburn Rd Ste 200 | Norcross | GA | 30093 | None | 1006312 | 1... |
| 691 N. Church Road, Suite 203 | Elmhurst | IL | 60126 | None | 887340 | 4... |
| 1101 North Prospect Avenue, Suite 200 | Itasca | IL | 60143 | None | 887341 | 1... |
| 5235 Westview Drive, Suite 100 | Frederick | MD | 21703 | None | 887343 | 1... |
| 112 Maxwell Lane | North East | MD | 21901 | None | 396343 | 1... |
| 307 Union Lake Road | White Lake | MI | 48386 | None | 650569 | None in NMLS |
| 1033 East Turkeyfoot Lake Road | Akron | OH | 44312 | None | 896131 | 1... |
| 26401 EMERY ROAD, SUITE 108 | CLEVELAND | OH | 44128 | None | 370790 | 6... |
| 130 North Miller Road, Suite 130 | Fairlawn | OH | 44333 | None | 1105076 | 1... |
| 3480 West Market Street, Suite 203 | Fairlawn | OH | 44333 | None | 910680 | 12... |
| 6133 Rockside Road, Suite 300 | Independence | OH | 44131 | None | 873307 | 1... |
| 60 Public Square, Suite 201 | Medina | OH | 44256 | None | 595446 | 9... |
| 696 East Washington Street, Suite 2B | Medina | OH | 44256 | None | 885974 | 6... |
| 7003 Pearl Road, Suite 16 | Middleurg Heights | OH | 44130 | None | 370765 | 2... |
| 12100 SNOW ROAD, SUITE 10 | PARMA HEIGHTS | OH | 44130 | None | 33060 | None in NMLS |
| 1113 Rockside Rd, Suite B | Parma | OH | 44134 | None | 794548 | 9... |
| 9800 Rockside Road, Suite 1000 | Valley View | OH | 44125 | None | 798771 | None in NMLS |
| 1768 Gayton Rd | Allison Park | PA | 15101 | None | 870467 | None in NMLS |
| 801 TRAVELERS BLVD | SUMMERVILLE | SC | 29485 | None | 356385 | None in NMLS |
| 1100 Russell Street, Suite 108 | Nashville | TN | 37206 | None | 885966 | 2... |

JF  JS

WLOJF

8

# EXHIBIT 2



LISTEN. SOLVE. EMPOWER.

P: 216.658.2155 F: 216.658.2156 W: bmdllc.com
200 Public Square, Suite 3270, Cleveland, Ohio 44114

February 28, 2018

**VIA EMAIL Sparks.jacob@gmail.com &
Jacob.sparks@nationslending.com**
Jacob Sparks

Re: **Termination of Recruiting Agreement**

Dear Mr. Sparks:

Effective as of February 26th, Justin Fitzhugh resigned his employment and terminated the Agreement of September 23, 2013 by and between you, Fitzhugh, and Nations Lending Corporation ("NLC"). This terminates your employment with NLC as of today.

Pursuant to Paragraph 14, NLC will continue paying you 12.5 basis points of the total loan volume of all non-brokered loans originated and closed by Recruits for a period of 24 months. In exchange for the continuing compensation, you have agreed to certain obligations, including restrictive covenants, as set forth in the Agreement.

If you have any questions regarding the continuing obligations under the Agreement, please feel free to contact me at your convenience.

If you want to discuss any future relationship with NLC, please directly contact Mr. Sopko or Mr. Osborne.

A member of the Human Resources team will contact you regarding employment termination procedures.

Best regards,

*/s/ Jeffrey C. Miller*

Jeffrey C. Miller


cc: Nations Lending Corporation