### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **JACOB D. SPARKS** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**JUSTIN FITZHUGH** )<br>)<br>Defendant. )<br>) | CASE NO. 1:22-CV-638<br><br>JUDGE FLEMING<br><br>**FIRST AMENDED COMPLAINT**<br>(with jury demand) |

For his First Amended Complaint against Defendant Justin Fitzhugh, Plaintiff Jacob Sparks states as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff was at all relevant times herein a United States citizen and a Florida resident.

2. Defendant Justin Fitzhugh is an individual who, at all times relevant, resided in Florida and Georgia.

3. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 because the parties are diverse from one another and the amount in controversy exceeds $75,000. Venue is proper in this judicial district and division under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here. In addition, the contract that is the subject of this Complaint, which is attached at EXHIBIT 1, contains a venue clause directing that the federal and state courts located in Cuyahoga County are the proper venues for disputes related to that contract.

## FACTUAL BACKGROUND

4. Sparks is a nationally recognized leader in retail development and recruiting.

5. Nations Lending Corporation ("NLC") is a full-service mortgage lender, with its principal place of business in Independence, Ohio.

6. NLC offers FHA, VA, Conventional, Jumbo, and USDA loans. It is an agency-direct lender with Fannie Mae, Freddie Mac, and Ginnie Mae and retains serving rights on approximately 96 percent of the loans it originates.

7. In 2013, after months of searching and due diligence, Sparks approached NLC to determine if his retail development and recruiting abilities would be a good fit for NLC.

8. Due to the sensitivity of the discussions, on July 23, 2013, NLC and Sparks entered into a *Non-Circumvention, Non-Disclosure, and Confidentiality Agreement* so they could freely explore the potential relationship.

9. After obtaining the non-circumvention agreement, Sparks then reached out to his brother-in-law, Fitzhugh, and introduced Fitzhugh as a potential recruiter to NLC.

10. At the conclusion of their discussions, NLC proposed hiring both Sparks and Fitzhugh as recruiters.

11. On September 23, 2013, the parties executed a written employment agreement (the "Agreement") which outlined their respective contractual obligations. A true and accurate copy of the Agreement, with certain sensitive and confidential terms redacted, is attached as EXHIBIT 1.

12. The Agreement states that its purpose was to "establish a business relationship" to "the mutual advantage" of Sparks, Fitzhugh, and NLC.

13. Under the Agreement, Sparks and Fitzhugh were both employed by NLC. They would "recruit and procure loan originators and branch offices" for NLC.

14. Sparks and Fitzhugh agreed to commit their professional energy to NLC, "within the mortgage industry, [to] work exclusively for NLC."

15. For the first six months of the Agreement, Sparks and Fitzhugh were each paid a salary of $10,000 per month plus a percentage of commissions earned as a result of loans closed by loan originators and branches recruited by Sparks and/or Fitzhugh.

16. Thereafter, Sparks and Fitzhugh were collectively paid a set commission from loans closed by loan originators and branches recruited by the Sparks and/or Fitzhugh.

17. Under the Agreement, the commissions generated from loans closed by loan originators and branches recruited by the Sparks and/or Fitzhugh were pooled.

18. Under the Agreement, from that pool, Sparks and Fitzhugh agreed that all commissions earned from NLC would "be divided equally between Sparks and Fitzhugh."

19. The Agreement also contemplated that any losses Sparks and Fitzhugh incurred would be shared between them.

20. Over the following 4+ years, Sparks and Fitzhugh grew NLC's loan base by **3,000%** -- bringing NLC from under $20 million in closed loans per month to more than $200 million of closed loans per month.

21. Indeed, in 2018, Inc. 5000 recognized NLC as one of the fastest-growing privately held companies in the country, and the company was named a top-100 lender by National Mortgage Professional Magazine and Scotsman Guide in 2019.

22. That growth is directly attributable to Sparks and Fitzhugh's work.

23. Beginning in early 2017, Fitzhugh began to demand that Sparks renegotiate the breakdown of compensation paid to each of them under the Agreement.

24. In fact, on March 1, 2017, Fitzhugh drafted and signed a proposed Addendum to the Agreement whereby he asked Sparks to agree to a revised split of their compensation. A true and accurate copy of the proposed Addendum, with certain sensitive and confidential terms redacted, is attached as EXHIBIT 2.

25. Under the proposed Addendum, Fitzhugh would receive sixty-five percent of the total pooled commissions, and Sparks would receive thirty-five percent.

26. Sparks refused to sign Fitzhugh's proposed Addendum, and Fitzhugh and Sparks were unable to reach any agreement to amend the terms of the Agreement.

27. On April 17, 2017, Sparks wrote to Fitzhugh that "we all memorialized the terms of our agreement in writing with the contract. There is legal language in the original agreement clearly stating that no changes will be made to the agreement without all signers agreeing to it in writing. I am exercising that provision at this time."

28. Indeed, paragraph 19 of the Agreement states that "[t]his Agreement may not be modified or amended except by written instrument executed by William Osbourne, and Jeremy Sopko, and Justin Fitzhugh, and Jacob Sparks."

29. Dissatisfied with that result, Fitzhugh complained to other NLC employees about Sparks and indicated a desire to re-negotiate his employment relationship with NLC.

30. On February 26, 2018, Fitzhugh purported to resign his employment with NLC.

31. His resignation was a sham. It was constructed and executed, with NLC's knowledge, to extricate Fitzhugh and NLC from the Agreement so that those parties could renegotiate a new compensation structure without consideration of their contractual obligations to Sparks.

32. Fitzhugh's sole motivation in his sham resignation was to supply NLC with a basis – albeit one not supported by contract, as shown below - for NLC to end its contractual relationship with Sparks.

33. In fact, two days after Fitzhugh's sham resignation, on February 28, 2018, NLC's attorney wrote to Sparks informing him that "Justin Fitzhugh resigned his employment and terminated the Agreement of September 23, 2013 by and between you, Fitzhugh, and Nations Lending Corporation ("NLC"). This terminates your employment with NLC as of today." A true and accurate copy of that letter is attached as EXHIBIT 3.

34. However, Fitzhugh's purported resignation had absolutely no impact on Sparks' contractual relationship with NLC under the Agreement.

35. Rather, the Agreement could not be terminated except as specified in Paragraph 15, which reads as follows:

> This Agreement, and/or the employment of Sparks, or Fitzhugh cannot be terminated by NLC except for the following reasons:
>
> (a) Due to the willful misconduct of either Sparks, or Fitzhugh which is not corrected within thirty (30) days of both (i) a meeting in person with Recruiters, and NLC to specifically address such misconduct (ii) receipt of written notice of such misconduct by NLC to each Sparks and Fitzhugh;
> (b) If NLC receives official written notice from a regulatory or governmental authority within the mortgage industry that the employment of either Sparks or Fitzhugh is in direct violation of the law;

(c) Sparks or Fitzhugh is convicted of a crime which will cause NLC to lose their approval with Fannie May, Freddie Mac, Ginnie Mae, or FHA lending authority;
(d) Either Sparks or Fitzhugh are subject to a non-compete or other restrictive agreement as described in paragraph 4;
(e) If either Sparks of Fitzhugh are convicted of a felony which would cause NLC to not be able to employ them pursuant to regulatory guidelines.

36. None of the circumstances enumerated in Paragraph 15 of the Agreement at EXHIBIT 1 existed to support or substantiate Sparks' termination.

37. In fact, Sparks fulfilled every material obligation that he owed under the Agreement from his execution through the date of its termination.

38. Moreover, as stated above, Fitzhugh's resignation was artifice; he either remained employed with NLC continuously or returned to work with NLC within 72 hours of Sparks' termination.

39. Over the following weeks, Sparks made numerous attempts to engage NLC and continue his work there, but NLC refused to do so.

40. Despite his best efforts to mitigate his damages, the termination of the Agreement has caused Sparks significant monetary damage and loss.

## COUNT ONE
### Breach of Contract

41. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

42. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

43. The Agreement at EXHIBIT 1 gave rise to express contractual duties between Sparks and Fitzhugh, including the duty to enter into the Agreement for their mutual

benefit, the duty to pool compensation earned and split it equally, the duty to devote their professional efforts to their work at NLC, and the duty not to amend or modify the Agreement without all parties agreeing in writing.

44. The Agreement also gave rise to implied duties of good faith and fair dealing between Plaintiff and Defendant, including the obligation to refrain from conduct that destroys or injures the other party's right to receive the benefits of the contract.

45. Through the acts described above, Defendant breached his duty of good faith and fair dealing owed to Sparks.

46. As a direct and proximate result of Defendant's breach of duty described in this Count, Sparks has suffered damages in an amount to be determined at trial.

## COUNT TWO
### Breach of Fiduciary Duty Owed to Partner or De Facto Partner

47. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

48. By entering into the Agreement, Sparks and Fitzhugh agreed to associate with each other to carry on the business of recruiting loan officers and branches for NLC.

49. By entering into the Agreement, Sparks and Fitzhugh agreed to pool the commissions accrued through their recruiting efforts for NLC.

50. By entering into the Agreement, Sparks and Fitzhugh agreed to split equally all compensation payable from NLC created through their work.

51. Sparks and Fitzhugh's relationship with respect to the Agreement was that of partners.

52. As partners with respect to the Agreement, Sparks and Fitzhugh owed each other fiduciary duties of loyalty and good faith.

53. Fitzhugh breached his fiduciary duty to Sparks by, *inter alia*, resigning from NLC and reinstituting his relationship with NLC just days later to the detriment of Sparks.

54. As a direct and proximate result of Defendant's breach of duty described in this Count, Sparks has suffered damages in an amount to be determined at trial.

## COUNT THREE
### Tortious Interference with Contract

55. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

56. As described above, Sparks had a contract for employment with NLC.

57. Fitzhugh was also a party to that contract and, as such, had actual knowledge of Sparks' contract NLC that Fitzhugh.

58. Fitzhugh intentionally, purposely, and tortiously interfered with Sparks' contractual relationship with NLC.

59. Fitzhugh lacked justification for his conduct, which was independently wrongful, as described above.

60. As a result of Fitzhugh's tortious interference, Sparks has suffered damages in an amount to be determined at trial.

## COUNT FOUR
### Breach of Fiduciary Duty as Joint Venturer

61. Sparks incorporates by reference the foregoing allegations as if fully rewritten herein.

62. Sparks and Fitzhugh agreed to combine their efforts, property, money, skill and/or knowledge in engaging in and carrying out their work for NLC.

63. In so doing, Sparks and Fitzhugh agreed to associate as joint venturers.

64. Fitzhugh breached his obligations to Sparks through the conduct described above.

65. As a result of Fitzhugh's breach, Sparks has suffered damages in an amount to be determined at trial.

WHEREFORE, Sparks prays for judgment in his favor, as follows:

i. Against Defendant and in favor of Sparks on each of the Counts of his Complaint in an amount in excess of $25,000 to be determined at trial;

ii. An award of pre- and post-judgment interest;

iii. An award of costs and attorneys' fees, as applicable under relevant law and the Agreement at EXHIBIT 1; and

iv. Any further relief, legal or equitable, to which Sparks may be entitled.

/s/ Joshua B. Fuchs
Joshua B. Fuchs (0087066)
**THE FUCHS FIRM LLC**
24870 Fairmount Boulevard
Beachwood, Ohio 44122
Tel. and Fax: 216-505-7500
josh@fuchsfirm.com

/s/ Scott D. Perlmuter
Scott D. Perlmuter (0082856)
4106 Bridge Avenue
Cleveland, Ohio 44113
216-308-1522
Fax: 888-604-9299
scott@tittlelawfirm.com

## JURY DEMAND

Plaintiff demands a trial by jury of all eligible claims and issues.

/s/ Joshua B. Fuchs
Joshua B. Fuchs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of May, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties who have made an appearance by operation of the Court's electronic filing system and those parties may access the filing through the Court's system.

/s/ Joshua B. Fuchs